IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NEW CENTURY BANK d/b/a           :      CIVIL ACTION
CUSTOMERS BANK                    :
                                  :
         v.                       :
                                  :
OPEN SOLUTIONS, INC.              :      NO. 10-6537

FINDINGS OF FACT
AND CONCLUSIONS OF LAW

Bartle, C.J.                                    March 7, 2011

Plaintiff, New Century Bank, doing business as Customers Bank ("Customers"), has filed suit against defendant Open Solutions, Inc. ("OSI") for conversion, replevin, and declaratory relief related to certain data files it acquired from a failed bank through the Federal Deposit Insurance Corporation ("FDIC"). OSI counterclaimed against Customers for breach of contract and declaratory relief. Following a bench trial, the court makes the following findings of fact and conclusions of law.

I.

On July 9, 2010, USA Bank failed and was closed. The FDIC was appointed receiver, and on July 9, 2010, the FDIC and Customers entered into a Purchase and Assumption Agreement ("Purchase Agreement") in which Customers acquired substantially all of USA Bank's assets, including its electronic customer data. See 12 U.S.C. § 1821(c).

Two sections of that Purchase Agreement are particularly relevant here. Section 4.7 governs "Data Processing Equipment and Leases." Under this section, Customers had 90 days from July 9 to exercise an option "to: (i) accept an assignment from the [FDIC] of all leased Data Processing Equipment and (ii) purchase at Fair Market Value from the [FDIC] all owned Data Processing Equipment." Customers admits that a failure to give any notice to the FDIC within 90 days would mean that Customers had agreed to assume leases of such equipment and to purchase such equipment. The Purchase Agreement defines Data Processing Equipment as "any equipment, computer hardware, or computer software (and the lease or licensing agreements related thereto) other than Personal Computers, owned or leased by [USA Bank] [on July 9, 2010], which is, was, or could have been used by [USA Bank] in connection with data processing activities."

The next section of the Purchase Agreement, § 4.8, applies "to agreements existing as of [USA Bank's] Closing which provide for the rendering of services by or to [USA Bank]." Section 4.8 requires Customers to give the FDIC notice within 30 days of whether it will or will not assume such contracts. Section 4.8 further provides that Customers "shall be deemed by the [FDIC] to have assumed agreements for which no notification is timely given." The significant difference between § 4.7 and § 4.8 for present purposes is that Customers had 90 days to reject contracts governed by § 4.7 for "Data Processing Equipment

and Leases" while it had only 30 days to reject contracts "for the rendering of services" encompassed by § 4.8.

Shortly after the Purchase Agreement was signed, the FDIC provided Customers with a list of contracts to which USA Bank had been a party and which identifies the contracts with "index numbers."  This list included a contract with OSI signed December 31, 2008 bearing index number 265.  On this list, the FDIC described the "type of service" OSI provided under that contract as "Data Processing."  The FDIC's list further noted that Customers had a 90-day option on this contract.  In addition to this list, the FDIC provided to Customers electronic files containing the contracts that corresponded to each index number.  Thus, Customers had all the contracts for review.  For the contract bearing index number 265, the electronic file Customers received contained not only the December 31, 2008 contract ("2008 Agreement") between USA Bank and OSI, but also an August 31, 2005 contract ("2005 Agreement").

The 2005 Agreement was signed between USA Bank and OSI's predecessor, BISYS Information Solutions, L.P. ("BISYS").  Entitled "Services Agreement," it obligated BISYS to provide USA Bank with certain data processing services in exchange for agreed-upon payments by USA Bank.  OSI is the successor in interest to BISYS.  The 2005 Agreement allowed USA Bank to enter customers' debits, credits, transactions, and personal information using proprietary BISYS software loaded on USA Bank computers.  All processing and storage of such data occurred on

BISYS's computer, called a data center, located on BISYS property.  Similarly, transactions a customer executed on USA Bank's internet website were processed at BISYS's data center.

The BISYS data processing system that USA Bank paid to use under the 2005 Agreement is called Total Plus.  While USA Bank acquired a license from BISYS to use the Total Plus software on the bank's premises, USA Bank did not lease that software or purchase it from BISYS.  The electronic files in which BISYS stored USA Bank's customer data are incompatible with any other data processing system.  Thus, those files cannot be loaded into another company's data processing computer program without first translating those files into a different format.

USA Bank's monthly payments to BISYS depended on the volume of services that BISYS rendered during the month, subject to a mandatory minimum charge.  The 2005 Agreement also specified the charges USA Bank would pay in the event it desired to terminate its relationship with BISYS.  Section 9(B) of the 2005 Agreement provides:

> At [USA Bank's] request ... BISYS shall deliver to [USA Bank] all of the [USA Bank] Files then retained by BISYS including file layouts and their descriptions in BISYS format and shall provide in accordance with BISYS deconversion policies, reasonable and necessary assistance with the deconversion from the BISYS System to a non-BISYS system ("Deconversion"). [USA Bank] shall pay BISYS for Deconversion assistance in accordance with BISYS' then current Deconversion rate schedule. Payment for Deconversion together with all other payments which are due, and

> which will become due pursuant to the
> provisions of this Agreement shall be
> paid to BISYS prior to delivery of such
> [USA Bank] Files.

The testimony of OSI employees confirmed that § 9(B) contemplated "Deconversion" as a transition from a BISYS system to a non-BISYS system.

The second contract contained in the electronic file that Customers received from the FDIC in connection with index number 265 was the 2008 Agreement, executed after OSI had acquired BISYS. Under the Agreement, called a "Data Processing Services Agreement," OSI is to transition USA Bank to a different OSI data-processing systems called the DNA system. As with Total Plus, OSI would own the DNA system software on USA Bank's computers, and all data processing and data storage activities would occur on OSI's data center. In December 2008, OSI also offered a version of the DNA system in which the customer bank conducts all data processing on the bank's own computers, but this is not the version of the DNA system USA Bank purchased. Section IX(B) of the 2008 Agreement contains language nearly identical to the portion of § 9(B) of the 2005 Agreement quoted above, except that the name "BISYS" has been replaced with the name "Open Solutions."

Shortly after the acquisition, Customers considered the contracts listed under FDIC index number 265 as service contracts under § 4.8. On October 5, 2010, Customers requested a 30 day extension of the deadline under "Section 4.8(a)(i) of the

Purchase and Assumption Agreement" to notify the FDIC whether it would assume "such agreements, which include the agreement dated December 31, 2008 between USA Bank and Open Solutions, Inc." The FDIC granted this request on October 7 but stated that it was extending the option period under § 4.7(a) for data processing equipment leases. At no time did the FDIC purport to extend the option period under § 4.8(a) for service contracts.

On October 29, 2010, a Customers representative emailed FDIC employee Robert Schoppe a draft of a "repudiation letter for OSI" that Customers proposed to send to the FDIC. The draft states in two places that the contracts discussed in the letter, including USA Bank's contract with OSI, are subject to § 4.8 of the Purchase Agreement. The draft requests "a transition period of up to six months (approximately April 15, 2011) to transfer the respective services to our current service provider to ensure that customer service is not disrupted." On November 1, 2010, Schoppe notified Customers that the October 29 draft "would be accepted as written."

On November 3, 2010, Customers emailed the FDIC a second draft letter it proposed to send to the FDIC regarding contracts Customers desired not to assume, including contract number 265 with OSI. Customers' two references to § 4.8 of the Purchase Agreement remained unchanged, but Customers also inserted a statement that the contracts at issue were subject to

§ 4.7(a) of the Purchase Agreement.[1] Later that same day, Customers formally sent a substantially similar version of this letter to the FDIC. The letter states Customers will not assume USA Bank's contract with OSI. Neither the formal letter nor any draft specifically mentions the two distinct contracts, that is the 2005 Agreement and the 2008 Agreement.

On November 9, 2010, the FDIC notified OSI that the FDIC was disaffirming OSI's contract for "Services: Data Processing Services dated December 31, 2008." The repudiation is to be effective as of February 3, 2011. The letter makes no reference to the 2005 Agreement, and the FDIC has not subsequently repudiated the 2005 Agreement.[2]

As noted above, the FDIC signed the Purchase Agreement with Customers on July 9, 2010. The 30-day period for rejection of contracts subject to § 4.8 expired on August 8, 2010, while the 90-day rejection period for contracts under § 4.7 was originally set to expire on October 7, 2010 but was extended by the FDIC until November 6, 2010.

Since Customers acquired USA Banks' assets, Customers and the FDIC have had access to the USA Bank customer data, which

---

1. This second draft asks for a transition period ending February 3, 2011 instead of April 15, 2011.

2. OSI indicated that the FDIC may have attempted to disaffirm the 2005 Agreement on the eve of trial. Since discovery had closed and no admissible evidence was introduced at trial on this point, the court will not consider this purported repudiation in resolving the claims before the court.

has allowed Customers to operate the former USA Bank branches and service former USA Bank customers without interruption.

The FDIC requires that Customers integrate USA Bank's customer data with Customers' existing data processing system. Customers performs data processing for its non-USA Bank customers on the version of OSI's DNA system that allows the bank to conduct data processing on its internal computers. In order to integrate the USA Bank data with its existing data processing system, Customers must obtain that data in a format compatible with that system. Customers has two options for rendering data into such a format. First, Customers may access the USA Bank data and re-enter that information manually into its own computer system, a process known as "manual deconversion." Customers has sole responsibility for this type of deconversion, and OSI will not impose any charge on Customers for doing so. Customers' second option is to pay OSI to perform an "automated deconversion" in which OSI's proprietary software is employed to place the files in the requisite format. Both parties produced expert witnesses who testified that a manual deconversion, which is sometimes used, is technically possible although it is more time-consuming and more prone to error than the automated deconversion. The experts disagreed on the amount of time and risk involved in manually deconverting the data pertaining to the former USA Bank's 3,500 customers.

Customers alleges that OSI is wrongfully depriving Customers of its property, that is, the USA Bank customer data,

by insisting on an unreasonable price to perform an automated deconversion. Customers' complaint requests relief in conversion and replevin, as well as a declaratory judgment that it is entitled to obtain an automated deconversion from OSI for a reasonable price.

OSI counterclaimed for breach of the 2005 and 2008 Agreements and for a declaratory judgment that Customers has assumed those agreements.[3] OSI alleges that Customers assumed both agreements by failing to notify the FDIC of its election to reject those agreements within the 30 day option period applicable to service contracts under § 4.8 of the Purchase Agreement.

Prior to trial, Customers moved to dismiss OSI's counterclaims. It argued that OSI lacked standing to assert that Customers assumed the 2005 or 2008 Agreements pursuant to the terms of the Purchase Agreement between Customers and the FDIC. The court explained in a memorandum dated January 25, 2011, that § 4.8 of the Purchase Agreement, not § 4.7, applied to the 2005 and 2008 Agreements because they are service agreements and not leases of data processing equipment. Taking all of OSI's alleged facts as true, we reasoned that Customers did not provide notice to the FDIC within the 30 day option period defined in § 4.8(a), and by operation of the Purchase Agreement, Customers had

---

3. OSI has dismissed a third count of its counterclaim in which it sought to enforce an alleged settlement agreement between OSI and Customers.

automatically assumed the 2005 and 2008 Agreements. The court determined it would be inequitable to find that, having placed itself in privity of contract with OSI under the terms of the Purchase Agreement, Customers could avoid liability on those contracts by claiming OSI lacked standing to rely on the Purchase Agreement in pleading its claims. Subsequently, Customers filed a motion for reconsideration asking the court to reevaluate its ruling.

## II.

Customers first claims that OSI has converted its USA Bank customer data by refusing to perform an automated deconversion of that data unless Customers pays a large sum that Customers contends it is not and should not be required to pay.

Under Pennsylvania law, "Conversion is a tort by which the defendant deprives the plaintiff of his right to a chattel or interferes with the plaintiff's use or possession of a chattel without the plaintiff's consent and without lawful justification." Pittsburgh Constr. Co. v. Griffith, 834 A.2d 572, 581 (Pa. Super. Ct. 2003). Pennsylvania law recognizes the tort of conversion as applied to computer programs, but has not specifically addressed conversion of electronic records. See Computer Print Sys., Inc. v. Lewis, 422 A.2d 148, 156-57 (Pa. Super. Ct. 1980). However, New York's law of conversion, which is similar to Pennsylvania's, recognizes that conversion occurs when a defendant deprives the plaintiff of access to business

records stored on the defendant's computer system. <u>Thyroff v. Nationwide Mut. Ins. Co.</u>, 864 N.E.2d 1272, 1277-78 (N.Y. 2007).

OSI defends against Customers' conversion claim by arguing that Customers has actual possession of the data and that Customers can perform a manual deconversion at any time. OSI also maintains that under § 9(B) of both the 2005 and 2008 Agreements, OSI is entitled to receive all future payments that will become due under those contracts before it is obligated to perform an automated deconversion. Under the 2005 Agreement, OSI calculated this amount as over $1.2 million.

OSI and Customers agreed that one party, holding another's property, may not condition the return of that property on the other paying an unreasonable sum. This has long been the law in Pennsylvania. <u>See</u> <u>Lowenstein v. Bache</u>, 41 Pa. Super. 552 (Pa. Super. Ct. 1910) (citing <u>Astley v. Reynolds</u>, 2 Strange 916). While OSI alleges the sum of $1.2 million is due under the terms of the 2005 Agreement before any automated deconversion takes place, OSI is incorrect.

A "Deconversion" within the meaning of § 9(B) of either the 2005 Agreement or the 2008 Agreement refers only to the process of moving data from an OSI data processing system to a non-OSI data processing system. An OSI employee testified that the purpose of § 9(B) is to define the parties' obligations if a customer intended to purchase data processing services from a different vendor. As noted above, § 9(B) defines "Deconversion" as a transition "from the BISYS System to a non-BISYS system."

Because Customers seeks to migrate the USA Bank data from OSI's Total Plus system to OSI's DNA system, its desired deconversion is not within the 2005 or 2008 Agreement's definition of "Deconversion." Thus, regardless of whether Customers is a party to the 2005 or 2008 Agreement as OSI alleges, Customers' request would not trigger any obligation to remit all future payments due under § 9(B) of those contracts. OSI's insistence on Customers paying $1.2 million before performing an automated deconversion is not a contractual obligation owed by Customers to OSI.

Nevertheless, a judgment in conversion is inappropriate on these facts. Customers does not dispute that it presently has access to the USA Bank data. Similarly, there has been no evidence that OSI's possession and storage of the data in the Total Plus format has impeded Customers' operation with respect to the former USA Bank's customers or data. Customers has "possession" of the data because it has full access to that data in its business operations. There has been no evidence that OSI will restrict Customers' access to the USA Bank data in the future.

To the extent Customers desires to "possess" the data by storing and accessing it in a different format, it may do so regardless of OSI's negotiating position. Significantly, Customers acknowledges that it is not entitled to an automated deconversion for free and concedes that OSI is entitled to compensation if OSI is to perform that service. Furthermore,

Customers' expert witness has not convinced the court that a manual deconversion, as opposed to an automated deconversion, presents such a high risk of error or is so expensive as to make manual deconversion a practical impossibility.  As such, Customers has the present capability manually to transition the USA Bank data onto its computing platform even if that option may be more expensive and may expose Customers to some risk of data-entry errors.  Even automated deconversion, we emphasize, has its risks.  Because Customers has access to its data and may move that data to its own computers or elsewhere at any time, OSI's refusal to perform an automated deconversion at a price agreeable to Customers is not an unlawful interference with Customers' possession of the USA Bank data.  The 2005 Agreement does not set the price for an automated deconversion, and the court will not impose on these sophisticated parties a price or the terms under which OSI must perform the service with its proprietary software.

Count II of Customers' complaint states a claim for replevin.  Replevin "is a legal form of action ordinarily employed only to recover possession or the value of specific personal property unlawfully withheld from the plaintiff plus damages for its detention."  Brandt v. Hershey, 182 A.2d 219, 221 (Pa. Super. Ct. 1962).  The primary purpose of replevin is to recover certain identifiable property.  See Commonwealth ex rel. Anderson v. Fid. & Deposit Co. of Md., 811 A.2d 1040, 1042-43 (Pa. Super. Ct. 2002); Commonwealth v. Dean, 369 A.2d 423, 425 (Pa. Super. Ct. 1976).

The USA Bank data that Customers obtained under the Purchase Agreement with the FDIC on July 9, 2010 resides on OSI's data center in the Total Plus format as a result of OSI's contractual obligation to the former USA Bank. Nonetheless, Customers has possession of the data in that it has full access to and use of it. The only issue is the means of deconversion. The evidence establishes that there are two mechanisms for moving the purchased data from OSI's data center onto Customers' computers in the necessary format: manual deconversion or automated deconversion. Customers has not proven that it has a contractual or other legal right to demand the automated deconversion service from OSI it desires.

Moreover, Customers has not shown that OSI has "unlawfully withheld" the USA Bank data from Customers because as noted above Customers has complete access to and use of that data, and OSI will not impede Customers performing a manual deconversion. Accordingly, there is no identifiable property for Customers to recover from OSI. Customers' claim for replevin fails.

Finally, in Count III of its complaint, Customers states that it "is entitled to a declaration that OSI is obligated to deconvert and return Customers' customer files, data and other information." In order to maintain an action for declaratory judgment,[4] "a plaintiff must establish an interest

---

4. Neither the complaint nor the counterclaim states whether its
(continued...)

which must be a direct, substantial and present interest, as contrasted with a remote or speculative interest." Bromwell v. Mich. Mut. Ins. Co., 716 A.2d 667, 670 (Pa. Super. Ct. 1998). Customers has not identified any proper legal basis to have the court declare the existence of such an entitlement. We will deny Customers' claim for declaratory judgment.

The common thread in each count of Customers' complaint is a request that the court order OSI to perform an automated deconversion at a more reasonable price than OSI demands. Neither the 2005 nor 2008 Agreement sets forth the sum OSI has demanded to perform an automated deconversion. Indeed, neither the price nor any requirement of automated deconversion when transitioning between two OSI-owned data processing services is provided for in either Agreement. Based on the record before us, OSI is free to set the price to perform "automated deconversion" and Customers is free to accept or not accept it, try to negotiate a better deal, or engage in manual deconversion. On the facts proven, none of Customers' theories empowers the court

---

4.(...continued)
res pective declaratory judgment action is based on Pennsylvania's Declaratory Judgments Act, 42 Pa. Cons. Stat. §§ 7531-7541, or the federal Declaratory Judgment Act, 28 U.S.C. § 2201. The court has jurisdiction over both declaratory judgment claims solely on the basis of diversity of the parties' citizenship and must therefore apply the law of the forum state. Liberty Mut. Ins. Co. v. Sweeney, 216 F.2d 209, 210 (3d Cir. 1954). As a result, whether these claims were pleaded under the Pennsylvania declaratory judgment statute or its federal analog, the substantive law of Pennsylvania applies. See id.; Hanna v. State Farm Fire and Cas. Co., Case No. 06-3242, 2007 WL 2343778, at *3 (E.D. Pa. Aug. 13, 2007).

to decree that OSI must perform an automated deconversion or that OSI must do so at a particular price.

### III.

Next we turn to Customers' motion for reconsideration and Count II of OSI's counterclaim, which require analysis of the same two issues: whether § 4.7 or § 4.8 of the Purchase Agreement provided Customers' option period under the Purchase Agreement and whether OSI has standing to base its counterclaims on its interpretation of the Purchase Agreement.  As noted above, § 4.7 applied to leases of data processing equipment and provided Customers 90 days to notify the FDIC whether it would assume such leases.  Section 4.8 applied to all service contracts and allowed Customers only 30 days to notify the FDIC whether it would assume those service agreements.  Section 4.8 states that a failure to provide any notice within 30 days would result in Customers assuming the service contracts.  In our memorandum and order dated January 25, 2011 we concluded that Customers automatically assumed the 2005 and 2008 Agreements if it did not communicate its desire not to assume those contracts within the 30-day option period created in § 4.8 and the OSI had standing to bring claims based on this reading of the Purchase Agreement.

The 2005 and 2008 Agreements are clearly contracts for the provision of services to USA Bank.  They are not leases of software or other data processing equipment.  Accordingly, Customers was obligated to provide the FDIC with notice within 30 days of July 9, 2010 in order to avoid assuming those contracts

-16-

under § 4.8 of the Purchase Agreement.  The evidence at the trial established that Customers failed to do so, and by operation of the Purchase Agreement, Customers automatically assumed those agreements.

Section 4.7 of the Purchase Agreement, we reiterate, does not apply to the USA Bank's 2005 and 2008 Agreements with OSI.  The list of contracts the FDIC supplied to Customers indicates Customers had a 90-day option on USA Bank's 2008 Agreement with OSI, suggesting § 4.7 of the Purchase Agreement applied.  Yet, Customers received and had the opportunity to review each of the contracts provided by the FDIC and also had a copy of the Purchase Agreement.  Moreover, the draft correspondence that Customers sent to the FDIC, which the FDIC reviewed and approved, explicitly states that § 4.8 of the Purchase Agreement applies to the 2008 Agreement.[5]  We find that Customers was not mistaken in its reference to § 4.8.  Thus, Customers was not relying on the FDIC's 90-day rejection deadline, which encompasses only contracts under § 4.7 but rather was fully aware of the 30-day deadline applicable under § 4.8 to both the 2005 and 2008 Agreements.  It did not reject either the 2005 or 2008 Agreement within that time frame.

Customers' motion for reconsideration argued that the 2005 and 2008 Agreements qualified as leases of data processing

---

5. Customers' formal correspondence to the FDIC states that both provisions apply.  A Customers' employee testified that references to § 4.8 were mistakes.  Yet these purported mistakes carried through numerous drafts and FDIC review.

-17-

equipment within the meaning of the Purchase Agreement because OSI authorized USA Bank to use OSI software in § 10 of those agreements. Under the Purchase Agreement, "Data Processing Equipment" includes "computer software (and the lease or licensing agreements related thereto) ... <u>owned</u> or <u>leased</u> by [USA Bank]." (emphasis added). The 2005 and 2008 Agreements cannot be read as involving the selling or leasing of software. Rather, they are contracts for the provision of data processing services to USA Bank that incidentally grant USA Bank a license to use the limited software that OSI owned and installed on USA Bank computers at the tellers' stations. USA Bank made payments under the contracts for services OSI performed, not in exchange for any software license. The evidence at trial supports the conclusion that the 2005 and 2008 Agreements are not leases of data processing equipment. Contrary to Customers' argument, § 4.8 of the Purchase Agreement governed Customers' option on the 2005 and 2008 Agreements.

The court has also considered the arguments with regard to standing in Customers' motion for reconsideration and finds them unpersuasive. Section 4.8 of the Purchase Agreement applied to the 2005 and 2008 Agreements. Since Customers' failure to provide notice within the time period specified in § 4.8 of the Purchase Agreement amounted to an assumption of those agreements, OSI may hold Customers accountable for breach of the assumed 2005 and 2008 Agreements. Customers' motion for reconsideration will

be denied, and judgment will be entered in favor of OSI on its declaratory judgment claim.

IV.

Finally, we consider OSI's counterclaim for breach of the 2005 and 2008 Agreements. The 2005 Agreement is governed by Pennsylvania law, which requires evidence of a contract, breach of a contractual duty, and damages to the claimant to prove a claim for breach of contract. <u>Williams v. Nationwide Mut. Ins. Co.</u>, 750 A.2d 881, 884 (Pa. Super. Ct. 2000).

We find on the evidence presented that Customers has breached the 2005 Agreement by failing to pay $103,976.89 that OSI has invoiced for services rendered under the 2005 Agreement between July 2010 and February 2011.[6] Customers has not shown that these invoices had been paid, that OSI had not rendered the services for which the invoices issued, or that the 2005 Agreement did not require payment for such services.

OSI also asserts that Customers has committed a breach or an anticipatory breach of contract by insisting on receiving an automated deconversion without tendering all future amounts that will be due under the contract as required by § 9(B) of the 2005 Agreement. OSI has calculated its damages as $1,268,016.49, including $75,000 for the actual deconversion and $822,714.62 for payments that will become due under the 2005 Agreement in the

---

6. Trial was held on February 24, 2011. The summary of invoices OSI introduced shows accounts receivable through February 16, 2011, but includes a future payable of $22,617.76 that was due from Customers as of February 26, 2011.

-19-

future.  As discussed above, OSI's position hinges on a misapplication of § 9(B) of its own contract.  A "Deconversion" within the meaning of § 9(B) of the 2005 Agreement refers only to the process of moving data from a BISYS data processing system to a non-BISYS data processing system, which is not what Customers seeks to do.  Accordingly, Customers' request does not breach or suggest Customers will breach its obligations under § 9(B).  The payment obligations under that section have not been triggered, and OSI is not presently entitled to all future payments due under the 2005 Agreement.

The 2008 Agreement provides that it is to be interpreted under Delaware law, which like Pennsylvania law, requires a party asserting breach of contract to prove the existence of a contract, the breach of a contractual obligation, and damages.  See <u>VLIW Tech., LLC v. Hewlett-Packard Co.</u>, 840 A.2d 606, 612 (Del. Super. Ct. 2003).  OSI failed to disclose information about its alleged damages under the 2008 Agreement in response to Customers' discovery requests, and evidence on that issue was excluded in response to Customers' motion in limine.  <u>See</u> Fed. R. Civ. P. 37(c).  OSI did not prove any breach of or any damages under the 2008 Agreement, and thus, OSI's claim under this contract has not been proven.